# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CHRISTY McKINLEY, | No. 59321-1-II |
| Appellant, | |
| and | UNPUBLISHED OPINION |
| LARS SOMMER, | |
| Respondent. | |

CHE, J. — Christy M. McKinley appeals a final parenting plan and child support order concerning her and Lars Sommer's son, JS. She also challenges CR 11 sanctions imposed by the trial court.

McKinley moved for the trial court to reconsider its findings and conclusions entered in support of a final parenting plan after one of McKinley's sons unrelated to Sommer, PJM, alleged that Sommer forced him to stand in a compost bin full of thorns. The trial court agreed it would take new evidence on the issues of whether Sommer engaged in child abuse and whether McKinley engaged in abusive use of conflict. The trial court also set over other pending matters for JS such as child support and childcare issues to the trial.

During the trial, PJM's father testified that PJM told him he had lied to his therapist about part of the disclosure and that, before PJM's disclosure to his therapist, McKinley "had badgered

him so much, he just wanted her to stop talking about it."[1] The trial court allowed the testimony despite McKinley's hearsay objection.

The trial court ultimately found that PJM's father's testimony was credible, PJM had reported McKinley badgered him into making the allegation of abuse against Sommer, and McKinley orchestrated the allegation. The trial court concluded that Sommer had not engaged in child abuse, McKinley engaged in an abusive use of conflict that warranted limitations in the parenting plan, and CR 11 sanctions were warranted against McKinley.

The trial court limited McKinley's residential time with JS because of its finding that McKinley engaged in abusive use of conflict and granted Sommer sole decision-making. The trial court entered a final parenting plan, a child support order, and a judgment for the CR 11 sanctions based on its findings.

Among other things, McKinley argues that the trial court's parenting plan conclusions and CR 11 sanctions were based on unsupported findings because the trial court relied on inadmissible hearsay testimony from PJM's father. Additionally, McKinley claims that the trial court erred in some of its child support findings and childcare expense decisions. Both parties request attorney fees and/or costs on appeal.

We hold that the trial court's findings that McKinley orchestrated PJM's allegation or coached PJM are unsupported by admissible evidence and the trial court heavily relied on these findings when it decided the final parenting plan and imposed CR 11 sanctions. However, we hold that the trial court did not abuse its discretion in deciding the child support order. We deny both parties' requests for attorney fees and costs on appeal.

---

[1] 4 Rep. of Proc. (Jan. 20, 2023) at 1142.

No. 59321-1-II

We reverse and vacate the trial court's final parenting plan and imposition of CR 11 sanctions and attorney fees, but affirm the child support order. However, if revising the child support order is necessary following entering a new parenting plan, the trial court is free to do so. We remand to the trial court and instruct that this matter be assigned to a different trial judge and handled as expeditiously as possible.

FACTS

*Background*

McKinley and Sommer are the parents of JS, who was born in September 2018. McKinley has two older children from previous relationships, PJM and BR, who lived with McKinley.

In January 2020, McKinley filed a petition for a parenting plan and child support order for JS. McKinley requested JS reside with McKinley except for every other weekend, a weekly overnight on Wednesdays, and alternating holidays when JS would reside with Sommer. *See* Clerk's Papers (CP) at 450.[2] McKinley also requested that the trial court enter RCW 26.09.191 restrictions against Sommer based on allegations of long-term emotional impairment and long-term impairment resulting from substance abuse.

After a multi-day trial in December 2021, the trial court rejected McKinley's request for .191 restrictions. The trial court entered a final parenting plan, which granted an equal share of residential time to each parent and joint decision-making to both parents. *See* CP at 653.[3]

---

[2] *McKinley v. Sommer*, No. 84636-1-I, slip op. (Apr. 17, 2023) (unpublished) https://www.courts.wa.gov/opinions/pdf/846361.pdf  (CP at 449-467).

[3] *McKinley v. Sommer*, No. 57891-3-II (Feb. 21, 2024) https://www.courts.wa.gov/opinions/pdf/D2%2057891-3-II%20Unpublished%20Opinion.pdf (*McKinley* II) (CP at 651-64).

The trial court also entered a temporary child support order. The child support order provided that McKinley and Sommer would be responsible for their proportional share of work-related childcare and preschool expenses. The order also noted that "Currently the parties have agreed to share the expense of the same childcare provider with whom they have guaranteed 40 hours a week." CP at 11.

In February 2022, McKinley appealed, raising multiple claims. Included in her claims, McKinley argued that the trial court erred by "failing to enter findings of fact and conclusion of law reflecting its consideration of the factors enumerated in RCW 26.09.187(3)(a)." CP at 453.

In September, at a presentation hearing, the trial court addressed childcare expenses. McKinley proposed that Sommer pay her a flat rate of $900 per month for childcare expenses. The trial court accepted her proposed flat rate until a later review hearing set for May 4, 2023. In a temporary child support order, the trial court ordered the parties to pay their proportional share of work related childcare and preschool expenses and stated that Sommer would pay a temporary flat rate of $900 for daycare starting September 1, 2022. *See* Ex. 60 at PDF 154.

Also in September, 8-year-old PJM told Kelsey Schank, his therapist at the time, that Sommer "would pick him up and shake him even when he told [Sommer] no and that [Sommer] picked him up and put him in a compost can full of thorns." 4 Rep. of Proc. (Jan 20, 2023) (4 RP) at 1103-04. As a mandatory reporter, Schank notified child protective services (CPS). Both McKinley and PJM's father, Ben Porter, were notified of the report but McKinley made no motions to the trial court regarding the disclosure against Sommer at that time.

A little over a week later, the trial court amended its January 2022 parenting plan, based on grounds unrelated to PJM's disclosure, but the general structure of joint decision-making and

the equal share of residential time did not change. The trial court also entered a new temporary child support order.

In January 2023, the trial court heard a motion by McKinley to change JS's surname from Sommer to Sommer-McKinley.[4] The trial court also heard a motion by Sommer for clarification of the September 2022 temporary child support order.

Regarding McKinley's motion, the trial court denied the motion as frivolous and concluded that it did not find changing JS's last name in JS's best interest. McKinley appealed. Regarding Sommer's motion, the trial court clarified that Sommer was to transfer $900 on the first of each month directly to McKinley for childcare expenses and that, at the end of the month, McKinley must provide "documentary proof of payment to the mutually agreed childcare providers." CP at 34. The trial court then stated that "Each [party's] 'Pro Rata' share will be reconciled monthly." CP at 34. The trial court also clarified that McKinley was to pay her share of preschool expenses back to September 12, 2022.

Thereafter, McKinley filed a motion for reconsideration from the court's ruling on Sommer's motion for clarification of the trial court's September 2022 temporary child support order. The trial court denied reconsideration of its order clarifying when and to whom childcare expenses were to be paid. On the issue of McKinley paying her proportionate share of preschool expenses, with the parties' agreement, the trial court reserved that issue and reimbursement or reconciliation arguments for a June review hearing.

---

[4] Prior to this petition, McKinley had made the same request to the Pierce County District Court, but that court determined that it did not have authority to rule on the matter because the Superior Court had retained jurisdiction.

Later that month, Sommer moved for findings in support of the trial court's January 2022 parenting plan. The trial court granted the motion and entered various written findings related to the parenting plan.

In April, Division I issued its opinion regarding McKinley's first appeal filed in February 2022. Division I of this court agreed with McKinley that the trial court failed to enter findings of fact and conclusions of law on RCW 26.09.187(3)(a) factors. Accordingly, Division I remanded for the trial court "to enter the necessary findings of fact and conclusions of law or to conclude that the evidence presented did not, in fact, allow for the entry of necessary findings." CP at 456. On remand, the trial court was free to amend any of its decisions in the matter if it came to believe that the evidence did not support its prior decisions. Division I affirmed as to McKinley's remaining claims including her claim that the trial court erred in declining to enter .191 restrictions against Sommer. Division I issued its mandate on June 2, 2023.

*Motion for Reconsideration of Parenting Plan Findings of Fact and Conclusions of Law*

In June 2023, McKinley brought a motion for reconsideration of the findings in support of the January 2022 parenting plan pursuant to CR 59[5] and based, in part, on "newly discovered evidence" that Sommer physically abused PJM. CP at 79. McKinley also claimed that Sommer made a unilateral decision to withdraw JS from a nanny-share, "consistently withheld payment for his pro rata share of childcare," and interfered with medical care for JS. CP at 255-56.

---

[5] Under CR 59, upon the aggrieved party's motion, the trial court may grant reconsideration of an order based on "[n]ewly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at trial," "materially affect[s] the substantial rights of such parties." CR 59(a).

In responding to McKinley's motion, Sommer requested CR 11 sanctions against McKinley. He argued that McKinley made the motion knowing that it was not well-grounded in fact or existing law, or good faith. He also argued that she "interposed [the motion] for an improper purpose, to harass, to cause unnecessary delay[,] and to needlessly increase in the cost of litigation." CP at 501. To support Sommer's arguments, among other things, Sommer relied on a declaration from Porter. In his declaration, Porter stated that PJM told him that McKinley "'reminded' him of the incidents [PJM] reported to the therapist . . . [and PJM] confide[d] in me stating that he wished [McKinley would] stop talking about it . . . and it was hurtful that she kept talking about it." CP at 578.

Later in June, the trial court continued the matters of child support, "[p]reschool and Childcare Issues as well as any issues related to payment and or reimbursement of such," McKinley's motion for reconsideration of its findings, and a motion by Sommer to supplement the trial court's March 2023 findings. CP at 43.

In August, the trial court held a hearing on these matters. McKinley requested that the trial court revert back to when she had more than 50 percent residential time. Sommer argued that, if the trial court were to grant reconsideration, it should make a finding that McKinley engaged in abusive use of conflict. Both parties proposed new parenting plans where they would have sole major decision-making and the other parent's residential time with JS would be limited to every other weekend and one weeknight visit with alternating holidays.

While expressing concerns about fairness and hearsay in Porter's declaration, McKinley requested appointment of a guardian ad litem (GAL) to interview PJM and "report about the

7

veracity [of his disclosure] and whether [the disclosure] impacts [JS's] residential schedule."

4 RP at 1075-76. The trial court responded:

> Okay. GALs make recommendations. They don't assess credibility. And GALs I have found to be of limited use . . . GALs are very different today than they used to be. And also, I have a problem in this particular case because, [] McKinley, I am well aware that you know all of the parenting investigators. So that -- or GALs.
>
> That would not be an option. So if I granted your motion for reconsideration on the issue of: Did I miss something with regard to [] Sommer being abusive to children, you would have to prove that case without a GAL. Are you willing to do that?

4 RP at 1076. McKinley agreed to prove the case without a GAL if her reconsideration motion was granted.

The trial court ordered "limited testimony" on two issues: (1) McKinley's allegation of child abuse and (2) Sommer's allegation that McKinley engaged in abusive use of conflict. CP at 45-46. The trial court also set over consideration of child support and preschool and childcare issues to the same hearing date.

The same day, the trial court entered an order incorporating its oral ruling from the December 2022 trial, written findings entered in January 2022, and the trial court's March 2023 written findings. The trial court supplemented these findings with additional written findings pursuant to Division I's mandate. Through its findings, the trial court again concluded that an equal residential schedule was in JS's best interests.

*Reconsideration Trial*

During the multi-day trial, four witnesses testified: Schank, Porter, Sommer, and McKinley. Their testimony included the following.

Schank saw PJM for 15 therapy sessions between August 2022 and January 2023 "to work on coping mechanisms, work on ADHD[6] symptoms, and impulse control." 4 RP at 1111. In September 2022, during PJM's fifth therapy session, PJM told Schank that Sommer "would pick him up and shake him even when he told [Sommer] no and that [Sommer] picked him up and put him in a compost can full of thorns." 4 RP at 1103-04. PJM told Schank "he was bloody and hurt for one month" and that his memory of the incident still made him upset. 4 RP at 1104. The memory was triggered through a sensation he experienced "at school through the heater." 4 RP at 1105. Schank believed PJM, had no reason to believe he was lying, and reported his disclosure to CPS.[7, 8]

After Schank contacted CPS, Schank contacted both McKinley and Porter. When McKinley asked Schank whether Porter appeared concerned when she contacted Porter, Sommer objected on the basis of hearsay and speculation. The trial court sustained the objection. When McKinley further argued to allow the testimony from Schank as a fact witness, the trial court stated, "It would be helpful to the court if you laid a foundation for her to be making any observations." 4 RP at 1108. Schank then testified to some of her background and experience as a licensed therapist. When McKinley tried again to elicit the testimony from Schank, Sommer objected because "[Schank] certainly doesn't have the expertise to read body language or the

---

[6] Attention deficit hyperactivity disorder.

[7] McKinley proffered a record of the CPS report. Sommer objected on the basis of hearsay and the trial court sustained the objection.

[8] In Sommer's response to McKinley's motion for reconsideration, Sommer argued that the therapist's report of PJM's disclosure was inadmissible hearsay. However, at trial, Sommer did not object to Schank testifying.

veracity of non-clients." 4 RP at 1109. The trial court agreed that Schank was not a body language expert.

Schank did not recall PJM bringing up the incident with Sommer again. When Schank stated that her recollection could be refreshed by looking at various notes in front of her, Sommer objected because McKinley had only provided him with treatment notes for the day PJM made the disclosure. Schank was testifying remotely, so additional treatment notes could not immediately be shared with Sommer. The trial court sustained the objection, stating, "But when you refresh recollection it's usually the other side has all the notes to follow along. You can't -- if only one note was provided, you can't then talk about all the other notes; so objection sustained." 4 RP at 1116.

Schank did not ask PJM to provide any additional information about the incident nor did Schank inquire whether or not PJM was treated for any injuries related to the disclosed incident. Schank also did not know whether PJM knew what a compost bin was even though Schank asserted that PJM used the term "compost" in his disclosure. Schank also did not know how old PJM was when he lived with Sommer or what the residential schedule was between Sommer and McKinley during the alleged incident. The trial court found that Schank was not a credible witness.

Porter testified under subpoena.[9] Porter testified that, after he was notified of PJM's disclosure to Schank, Porter spoke to PJM to "understand . . . what had happened in his words." 4 RP at 1146. When Sommer's counsel asked Porter what PJM reported, McKinley objected on

---

[9] Porter did not want to testify because he did not wish to anger McKinley or cause conflict that would cause further issues with co-parenting PJM or take Porter back into court.

the basis of hearsay. Sommer's counsel asserted that Porter's testimony is admissible as "an [ER] 803 (a) (3) hearsay exception as to the then existing mental, emotional, or physical condition of the child directly related to this incident." 4 RP at 1147. The trial court overruled McKinley's objection.

Porter then testified that PJM "mentioned to me that the bloody and hurt for a month was not the truth. . . . I asked him what the situation was. And he said again [in the summer of 2022] that his mother had badgered him so much, he just wanted her to stop talking about it." 4 RP at 1147. The trial court found this testimony credible. Porter did not know how the story underlying PJM's disclosure developed, but believed that there was "a logical line" between PJM's disclosure and a statement PJM made to Porter that McKinley had told him "[Sommer] is a bad person and a dangerous person" and told PJM that he should not be around Sommer. 4 RP at 1155.

Porter bathed PJM frequently, never heard PJM disclose abuse by Sommer, and never observed PJM bleeding and in pain for a month. If PJM had scratches resulting in bleeding and pain for a month, Porter asserted that he would have observed such scratches and would have addressed PJM's pain. The trial court found this testimony "very credible." CP at 80.

McKinley sought to attack Porter's credibility by showing that he "has already been found to have abused the court system." 5 RP (Dec. 18, 2023) (5 RP) at 1472. To do so, McKinley proffered a copy of a transcript from an appeal of a case between herself and Porter. The copy had a certificate statement from a transcriber but had no seal from the appellate court. Sommer objected and the trial court rejected the transcript's admission because "[t]his is not a certified copy." 5 RP at 1472.

11

Sommer testified that, when he lived with PJM, he had a wire compost bin outside the house and a wheeled yard waste bin. Sommer and the kids regularly cleaned up the yard together. Sommer recalled one occasion that sounded similar to the incident PJM referred to in his disclosure:

> I was outside picking up sticks and branches . . . and I was putting leaves, small sticks into a yard waste bin.
>
> . . . .
>
> [T]o make more room in the yard waste bin, I jumped into it and stomped down the leaves and the sticks. And the boys both came over and said, "What are you doing? " And I explained it.
>
>     And they asked if they could help. And I lifted up [PJM] . . . [a]nd I pretended to have him stomp down the leaves and the branches. And then I lifted him out and that was the end of it. It was a fun little playful bonding time, and I went back to raking sticks and leaves.

5 RP at 1337-38. PJM was clothed, had shoes on, and was not injured. The trial court found this explanation of the incident and his testimony that PJM was not bloody and hurt to be credible.

McKinley testified that, when the alleged incident with PJM and Sommer could have occurred, McKinley and Porter had equal residential time with PJM and PJM attended two preschools. McKinley believed Sommer committed the acts PJM disclosed and she asserted that she did not say anything to PJM about the incident before his disclosure. She also testified that she saw Sommer pick up PJM and shake him during a previous incident prior to the case's first trial.[10] The trial court found McKinley's testimony not credible.

McKinley testified that her other son, BR, told her he had been in the therapy session when PJM made his disclosure and that he confirmed that the incident happened. BR later wrote

---

[10] According to McKinley, she was not allowed to provide this testimony during the first trial because it was found to be irrelevant in that case.

a school essay about the incident "as one of four incidents that impacted him and made him who he is." 5 RP at 1468. According to McKinley, "his school is now calling [her] and gathering more information to decide if they are calling CPS." 5 RP at 1468.

Upon becoming aware of PJM's disclosure approximately a year earlier, McKinley did not request any type of restraining order against Sommer. McKinley believed:

> there was no point in these proceedings in which that would have been -- this court would have been receptive to a restraining order [against Sommer for JS]. And I don't know that the court even had -- I don't believe the court would have had the authority to enter one without the Court of Appeals' permission.
>
> I brought this when it was procedurally allowed.

4 RP at 1129. And she did not seek a restraining order against Sommer for PJM because, at the time, she believed that Sommer was not regularly seeing PJM or seeing him unsupervised. The trial court found McKinley's testimony about her belief that she could not file an emergency motion not credible.

McKinley and Sommer also testified about their communication and responses throughout the years to medical issues with JS. Copies of their email correspondence were also admitted into evidence, many with photographs of JS. *See* Exs. 6 at PDF 76-82 and 101-14 at PDF 260-310. The admitted emails spanned from April 2021 to May 2023. *See* Ex. 112-13 at PDF 302, 306.

In an email chain from April 2021, McKinley asked Sommer if he knew what happened to JS's pinky finger. McKinley attached to the email a photo of JS's hand and stated, "I couldn't get a very good picture because he doesn't really want to sit still but the best one is attached." Ex. 114 at PDF 309. Another email chain included McKinley asking Sommer, in September

2021, what happened to JS's legs, arms, and face as she observed them being "really scratched up." Ex. 261 at PDF 261. In May 2023, McKinley emailed Sommer asking what happened to JS's neck and stating that he had "abrasions on it." Ex. 112 at PDF 302. McKinley told Sommer she was going to take JS to the doctor to have JS's neck examined. Sommer explained that JS had been swimming for hours while wearing a life vest that had rubbed his skin and caused redness. In the same email thread, McKinley also mentioned an injury on JS's elbow. Sommer replied, "Yes. [JS] tripped at the park while running and not looking where he was going." Ex. 112 at PDF 304. The trial court found these email exhibits credible evidence, "illustrating [] McKinley is looking for a reason to allege abuse by questioning every scratch or bump on the child, [JS]." CP at 81.

In October 2023, an incident occurred between JS and a neighbor's child where JS reported to Sommer that the six-year-old girl touched him inappropriately. When Sommer told McKinley what happened, McKinley called their pediatrician's office and they recommended that JS get checked at the emergency room. McKinley took JS to the emergency room without providing Sommer information on where and when McKinley and JS were going to the hospital.

Both McKinley and Sommer requested reimbursement for childcare expenses following the trial court's September 2022 order. McKinley also requested reimbursement for childcare expenses incurred before the September 2022 order. McKinley asserted that Sommer had not paid for his pro rata share of the incurred childcare expenses from May 2022 through November 2023. She alleged that Sommer underpaid by $2,985.60 for childcare expenses incurred between May 2022 and September 2022 and $4,251.86 for those expenses incurred between September 2022 late November 2023. Sommer contended that he overpaid for childcare expenses by over

$4,100 between September 2022 and May 2023. In support, Sommer proffered, and the trial court admitted for illustrative purposes only, exhibit 142: a document outlining the amounts Sommer paid, the childcare expenses, and Sommer's pro rata share for each month.

*Findings of Fact and Conclusions of Law*

Following the trial, the trial court entered written findings of fact and conclusions of law regarding the parenting plan, childcare, child support, and CR 11 sanctions.

In its written findings regarding the parenting plan, the trial court found that "credibility of the parties [was] extremely important." CP at 79. In finding McKinley's testimony not credible, the trial court noted that "[McKinley's] presentation became more disorganized as evidence was presented about coaching the child, PJ[M]." CP at 80. The trial court also made the following findings: (1) "Testimony established a one-time disclosure was made to [PJM's] therapist," (2) "No evidence was presented that CPS made any abuse findings against [] Sommer," (3) "Schank reports [PJM] never brought up the allegation in the next ten sessions," (4) "PJ[M] had childcare while [] McKinley worked during the time he was allegedly abused by [] Sommer," and (5) "[PJM] reported he was badgered by his mother into making his allegation against [] Sommer." CP at 80.

The trial court found no credible evidence that Sommer abused PJM and that "[t]here is credible evidence that the allegation of abuse was orchestrated by [] McKinley." CP at 81. In its oral ruling, the trial court stated, "Looking at all the evidence it is clear that [] McKinley did not prove there was any abuse of PJ[M] by [] Sommer and the evidence is clear that [] McKinley orchestrated the allegation of abuse to reopen the first parenting plan that she did not like." 6 RP (Jan. 5, 2023) (6 RP) at 1637.

15

Upon finding that sole decision-making was necessary in the case, the trial court granted the decision-making "regarding education, medical, preschool/daycare, extracurricular activi[ti]es once [JS] is in school, and any decision that requires parental consent" to Sommer. CP at 81. In doing so, the trial court stated, "Credible evidence was produced in emails and testimony from [] Sommer that [] McKinley circumvents the joint decision-making provision of the parenting plan by characterizing medical issues as emergencies and then taking the child to the emergency room, instead of to the child's pediatrician which would have required notice to [] Sommer under the parenting plan." CP at 81.

The trial court also found clear evidence that McKinley engaged in abusive use of conflict while Sommer did not. The trial court found that "McKinley does not want to co-parent and continues to look for reasons to change the parenting plan, and she mischaracterizes medical issues of [JS] to build a case for abuse." CP at 81. The trial court stated:

> Many issues are magnified by [] McKinley such as the incident with a neighbor child touching [JS] inappropriately. [] McKinley took [JS] to an emergency room instead of going to the pediatrician. [] McKinley overreacted to a rash on [JS]'s neck shown in Exhibit 123. [JS] had a rash from a life vest. [] McKinley took [JS] to the doctor and took a picture of the rash. Exhibit 116 relates to a pinky nail red mark that [] McKinley alleged something happened during [] Sommer's residential time. [] McKinley now says that her oldest son wrote an essay about abuse by [] Sommer against the child, PJ[M], and the school is gathering information to call CPS. The pictures, emails, and medical appointments over every small issue shows the desire to orchestrate evidence to reopen the parenting plan litigation. This conduct supports a finding of abusive use of conflict [by] McKinley.

CP at 81-82.[11]

_____

[11] Ex. 123 is a color copy of the photograph of JS attached to the email correspondence admitted in Ex. 112. Ex. 116 is a color copy of the photograph of JS's hand with his pinky nail, attached to the email correspondence admitted in Ex. 114.

The trial court found that McKinley engaged in abusive use of conflict that "may have adverse effect on [JS]'s best interests under 26.09.191(3)(e)." CP at 82. In doing so, it noted how "McKinley's allegations against [] Sommer evolved since the last trial . . . [w]hen the Court did not find abuse against her by [] Sommer and the Court did not find Mr. Sommer abused drugs, Ms. McKinley orchestrated an allegation of child abuse through [PJM]."[12] CP at 82.

The trial court additionally found the following:

(a) . . . the basis and timing of [] McKinley's bringing the matter to the Court was done in bad faith. Her request was not well-grounded in fact and her allegation resulted in six (6) days of unnecessary trial. The testimony by [] McKinley presented at the second trial was presented for the purpose to circumvent the previous findings in this court and final parenting plan on September 2, 2022.

b) [] McKinley engages in abusive use of conflict in a matter that possesses the danger of serious risk of emotional and psychological harm to the child, [JS].

c) The parties cannot co-parent as the court originally thought was possible. This is a high-conflict case because [] McKinley deliberately created conflict. There is insufficient evidence that [] Sommer failed to co-parent. The evidence shows that [] McKinley will not co-parent in good faith and mediation is not appropriate. Dispute resolution will be returning to court. Based on all the evidence presented after the granting of the CR 59 motion, the court finds it is not in [JS]'s best interest to further reside equally in both households and that his residential time in [] McKinley's household should be limited.

CP at 82.

Regarding childcare costs, the trial court found that Sommer had paid his childcare costs as ordered. In doing so, it noted:

The court hoped at the end of the last trial that the nanny would go back and forth between the houses. [] Sommer married shortly after the last trial. The Court ruled

---

[12] In the first trial, McKinley requested .191 restrictions based, primarily, on prior drug use by Sommer. At that trial, Sommer testified that he had not used illicit substances since August 2019 and marijuana or THC since December 2019. A court ordered drug test also came back negative for all substances. The trial court rejected McKinley's request to impose .191 restrictions on Sommer.

that [JS] should be enrolled in preschool. The evidence shows that [] McKinley re-enrolled [JS] in a preschool that [] Sommer objected to and modified the payment arrangements.

CP at 83. The trial court also stated that, in the temporary support order, it "tried to simplify the amount [] Sommer owed for daycare and ordered $900 per month . . . [t]he Court did not rule that if the childcare was more expensive, then additional childcare costs would be ordered." CP at 83. Additionally, although the trial court did not award Sommer any reimbursement for overpayment of childcare expenses, the trial court noted:

Exhibit 142 are calculations that could require [] McKinley to repay [] Sommer for overpayment of expenses. However, repayment would not allow [] McKinley time to adjust to the fact she will pay child support, instead of receive support, and could lead to insufficient funds in her household to support her children.

CP at 83.

Finally, the trial court found that CR 11 sanctions were appropriate in this case against McKinley. It found:

The CR 59 motion was not well-grounded in fact and filed to create issues so that the court would find abuse allegations against [] Sommer. There was no legal or factual support for [] McKinley's CR 59 motion based on the allegation of newly discovered evidence. [] McKinley drafted and filed a frivolous motion based on orchestrated evidence. [] McKinley drafted the motion in bad faith.

CP at 84.

Based its findings of fact and conclusions of law, the trial court entered a new final parenting plan, a final child support order, and imposed CR 11 sanctions against McKinley as well as a judgment to pay Sommer's attorney fees and costs. The trial court entered a final parenting plan that limited McKinley's residential time to every other weekend and alternating holidays with an up to thirty-minute video call every Tuesday evening.

18

The trial court ordered that "[e]ach party may select (and pay for) their own childcare provider for those childcare needs that are outside the times that the child is in pre-school, primary school or in before/school care." CP at 56. The trial court ordered any dispute resolution to go through the court.

The final parenting plan required McKinley to refrain from making, directly or by inference, negative or disparaging remarks about Sommer within earshot of any of McKinley's children. The parenting plan also prohibited McKinley from posting such comments on any social media platform. Moreover, the parenting plan required McKinley to participate in high conflict co-parenting counseling with Sommar where McKinley would pay for the counselor, who would be selected by Sommer. The parenting plan required this counseling to occur until the counselor believed the parties would not benefit from further sessions.

Regarding child support, the trial court adopted McKinley's income as listed by McKinley in her proposed worksheet. However, in the child support order, the trial court marked that it was imputing the net monthly income to McKinley because she was voluntarily underemployed. Nevertheless, the child support order imputed that same amount to McKinley as she listed for her net monthly income in her proposed child support order. The trial court also found Sommer's actual income to be that proposed in McKinley's proposed worksheet and consistent with Sommer's proposed schedule worksheet.[13]

---

[13] There was a little less than $1,500 difference between Sommer's declared net monthly income in his financial declaration and that in his proposed child schedule worksheet. *Compare* Ex. 133 at PDF 352, *with* PDF Ex. 134 at PDF 358. However, Sommer testified that the net monthly income listed in his proposed child support worksheet represented his current year-to-date income.

Thereafter, the judge in the case ordered the release of their jurisdiction and ordered that "[a]ny judicial officer may hear any motion or petition." CP at 649.

McKinley appeals.[14]

## ANALYSIS

### I. 2022 PARENTING PLAN

McKinley challenges the trial court's findings related to the January 2022 parenting plan. McKinley argues that (1) the trial court applied a presumption in favor of an equal residential time and (2) the trial court's RCW 26.09.187 findings were inadequate. Sommer argues that McKinley's arguments related to the former parenting plan are moot. We agree with Sommer and, accordingly, decline to consider McKinley's arguments.

An issue is moot "if a court can no longer provide effective relief." *Maldonado v. Maldonado*, 197 Wn. App. 779, 790, 391 P.3d 546 (2017). We generally do not review and decide issue that are moot unless the issues are of "substantial and continuing interest." *Blackmon v. Blackmon*, 155 Wn. App. 715, 720, 230 P.3d 233 (2010).

McKinley's arguments are related to a parenting plan that is no longer in effect. On McKinley's motion, the trial court granted reconsideration and agreed to consider new evidence on two issues. It reopened the January 2022 parenting plan and, thereafter, entered a new final parenting plan based on new findings.

---

[14] In February 2024, our court filed its opinion regarding McKinley's appeal of the trial court's denial of her motion to change JS's name. *See supra* at fn. 3. Our court vacated the trial court's order denying McKinley's motion and remanded back to the trial court for a new hearing on the motion. We also granted McKinley's request to reassign the matter to be before a different judge on remand "[t]o preserve the appearance of fairness." CP at 663.

McKinley does not argue that the trial court's findings related to the 2022 order amount to an issue of "substantial and continuing interest." Instead McKinley asserts that the findings from the former parenting plan continue to affect the parties and that the prior parenting plan would go into effect "if each party fails to meet their burden on reconsideration." Reply Br. at 4. However, McKinley does not explain how the 2022 parenting plan continues to affect the parties or why the trial court would necessarily have to impose the prior parenting plan even if we reverse the parenting plan entered upon reconsideration. Additionally, there is no indication that, in ordering the new parenting plan, the trial court either incorporated the former plan's findings or relied on past findings.

Because the challenged parenting plan is no longer in effect and there is no indication that the prior findings were incorporated into the new parenting plan, there is no effective relief that this court can provide in addressing McKinley's arguments. Therefore, McKinley's challenges to the trial court's findings related to the prior parenting plan are moot,[15] and we decline to address them.

## II. 2024 PARENTING PLAN

McKinley argues that the trial court's findings that PJM lied in his disclosure to his therapist and that McKinley either orchestrated PJM's allegation or coached him were unsupported. We agree.

---

[15] McKinley asserts that we cannot hold that the prior parenting plan is moot "but on the other hand, allow the [] Plan and findings to operate as the law of the case." Reply Br. at 4. "The term 'law of the case' means different things in different circumstances." *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 113, 829 P.2d 746 (1992). McKinley does not explain how, in this case, the prior parenting plan would operate as the law of the case and, thus, we do not find her argument persuasive.

21

A.      *Legal Principles*

We review a trial court's decisions regarding a parenting plan for an abuse of discretion. *In re Marriage of French*, 32 Wn. App. 2d 308, 314, 557 P.3d 1165 (2024). The trial court abuses its discretion if it makes a decision that is "manifestly unreasonable or based on untenable grounds or reasons." *Id.* If a decision is factually unsupported or reached by applying an incorrect legal standard, the decision is based on untenable grounds or reasons. *Id.*

We treat a trial court's unchallenged findings of fact as verities on appeal. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992). We also treat a trial court's findings of fact as verities on appeal when the findings are supported by substantial evidence. *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted." *Id.* (quoting *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012)). When the trial court has weighed the evidence, our role is "simply to determine whether substantial evidence supports the findings of fact and, if so, whether the findings in turn support the trial court's conclusions of law." *In re Marriage of Wilson*, 165 Wn. App. 333, 340, 267 P.3d 485 (2011). We do not substitute our judgment for that of the trial court, weigh evidence, or adjudge the credibility of witnesses. *Id.*

RCW 26.09.191 provides mandatory and discretionary bases for limiting provisions of a parenting plan.[16] A parent's residential time must be limited if the trial court finds that the parent

---

[16] The legislature recently made significant changes to this statute that went into effect on July 27, 2025. LAWS OF 2025, ch. 166, § 1. However, we review the trial court's decisions under the prior statute as it was in effect at the time of the trial court's decisions.

has engaged in "physical, sexual, or a pattern of emotional abuse of a child."[17]  RCW

26.09.191(2)(a).

The trial court has the discretion, however, to "preclude or limit any provision of the

parenting plan" if it finds:

> The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development.  Abusive use of conflict includes, but is not limited to, abusive litigation as defined in RCW 26.51.020.  If the court finds a parent has engaged in abusive litigation, the court may impose any restriction or remedies set forth in chapter 26.51 RCW in addition to including a finding in the parenting plan.  Litigation that is aggressive or improper but that does not meet the definition of abusive litigation shall not constitute a basis for a finding under this section.  A report made in good faith to law enforcement, a medical professional, or child protective services of sexual, physical, or mental abuse of a child shall not constitute a basis for a finding of abusive use of conflict.

RCW 26.09.191(3)(e).  To meet RCW 26.51.020's definition of "abusive litigation," there must

be a specific finding that the party filing, initiating, advancing, or continuing the litigation has

committed domestic violence against the other party.  RCW 26.51.020(1)(a)(ii).  The trial court

may also preclude or limit any provision of a parenting plan for any other factors or conduct that

the trial court expressly finds "adverse to the best interests of the child."  RCW 26.09.191(3)(g).

B.      *Substantial Evidence Does Not Support the Trial Court's Findings that McKinley*

*Orchestrated or Coached PJM's Allegation*

McKinley argues that the finding that McKinley orchestrated or coached PJM's

allegation was unsupported, in part, because the evidence the trial court relied on was

---

[17] A trial court need not apply this limitation "[i]f the court expressly finds based on the evidence that contact between the parent and the child will not cause physical, sexual, or emotional abuse or harm to the child and that the probability that the parent's or other person's harmful or abusive conduct will recur is so remote that it would not be in the child's best interests to apply the limitation[]."  RCW 26.09.191(2)(n).

inadmissible hearsay. She assigns error to the following findings: (1) "evidence was presented about coaching, PJ[M]," (2) "PJ[M] reported he was badgered by his mother into making his allegation against [] Sommer," and (3) "[t]here is credible evidence that the allegation of abuse was orchestrated by [] McKinley." Br. of Appellant at 2-3. On appeal, Sommer does not defend the trial court's decision to admit the challenged statements or its findings that McKinley orchestrated or coached PJM. Instead, Sommer argues that, even if PJM's statements were improperly admitted, other unchallenged findings of fact support the trial court's finding that McKinley engaged in an abusive use of conflict.

The trial court allowed Porter to testify that PJM told him that his report to Schank that he was "bloody and hurt for a month was not the truth" and that "his mother had badgered him so much, he just wanted her to stop talking about it." 4 RP at 1147. But McKinley objected to this testimony on the basis of hearsay, and the trial court overruled her objection after Sommer's counsel asserted the testimony qualified under ER 803(a)(3)'s hearsay exception.

RCW 26.09.191(6) provides, "In determining whether any of the conduct described in this section has occurred, the court shall apply the civil rules of *evidence*, proof, and procedure." (emphasis added). Under Washington's evidence rules, an out-of-court statement offered into evidence to prove the truth of the matter asserted, otherwise known as "hearsay," is inadmissible unless an exception applies. ER 801(c); ER 802. An exception exists for statements of the declarant's:

> *then existing* state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *but not including a statement of memory or belief to prove the fact remembered or believed* unless it relates to the execution, revocation, identification, or terms of declarant's will.

ER 803(a)(3) (emphasis added).  This exception exists regardless of whether the declarant is available to testify or not.  ER 803(a).

Here, Porter's testimony that PJM told him that he had lied to his therapist regarding part of his disclosure and McKinley had been "badger[ing] him" were not statements of PJM's then existing state of mind, emotion, sensation, or physical condition.  4 RP at 1147.  Instead, in both of PJM's statements, he recalled his state of mind *in the past* when he made his disclosure to his therapist.  Moreover, Sommer does not defend the trial court's decision in his briefing.  Because PJM's statements were not of any then-existing state of mind and Porter testified to PJM's statements to prove the truth of them, Porter's report of PJM's statements were inadmissible hearsay.

In its written findings, the trial court found that "PJ[M] reported he was badgered by his mother into making his allegation against [] Sommer."  CP at 80.  Porter's testimony was the only evidence of this fact and, as such testimony was inadmissible, substantial evidence did not support this finding.  In its findings of fact, the trial court also noted that the trial involved evidence "about coaching the child, PJM" and "that the allegation of abuse was orchestrated by [] McKinley."  CP at 80-81.  Without the inadmissible testimony, no fair-minded person would have been persuaded by other evidence presented that McKinley either orchestrated or coached PJM in his disclosure.

Even if Porter's testimony were admissible, PJM's alleged statement was not that McKinley badgered him *into* making the allegation.  Instead, PJM allegedly reported through Porter, "that his mother had badgered him so much, he just wanted her to stop talking about it."

4 RP at 1147. From Porter's testimony, it is unclear if "it" referred to the incident itself, PJM's entire disclosure, or just the part where PJM claimed he had been bloody and in pain for a month.

Because the trial court's finding that PJM reported McKinley had badgered him into making the allegation of abuse was based only on inadmissible evidence and no other substantial evidence supported the trial court's finding that McKinley orchestrated or coached PJM regarding the allegation, these findings of fact were unsupported.

C.      *The Unsupported Findings Warrants Reversal*

Having concluded that the trial court's findings that McKinley orchestrated or coached PJM's disclosure were unsupported, we must next determine whether the trial court's error was of sufficient magnitude to necessitate reversal.

"Even if a trial court relies on erroneous or unsupported findings of fact, immaterial findings that do not affect its conclusions of law are not prejudicial and do not warrant reversal." *State v. Coleman*, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018). An error is prejudicial when it affects, or presumptively affects, the outcome of the trial. *James S. Black & Co. v. P&R Co.*, 12 Wn. App. 533, 537, 530 P.2d 722 (1975).

Given the trial court's written findings and its oral ruling, we cannot say that its unsupported findings did not affect or presumptively affect the outcome of the trial here. Throughout its findings related to the 2024 parenting plan, the trial court repeatedly referred to its finding that McKinley orchestrated PJM's allegation. The court found that there was no credible evidence that PJM was abused by Sommer and that credible evidence existed that PJM's allegation of abuse was orchestrated by McKinley. The court noted that clear evidence showed

that McKinley orchestrated such "to reopen the first parenting plan that she did not like." 6 RP at 1637.

When the trial court next found that limitations were warranted against McKinley for engaging in abusive use of conflict, the trial court relied again on its finding that McKinley orchestrated the abuse to support its finding that she engaged in abusive use of conflict under RCW 26.09.191(3)(e). From its findings of fact, the trial court concluded that McKinley brought the matter back to the trial court "in bad faith," that she engaged in abusive use of conflict in a manner that posed a serious risk of emotional and psychological harm to JS, and that the case was a high-conflict case "because [] McKinley deliberately created conflict." CP at 82.

Sommer argues that any error with admitting PJM's statements was not prejudicial because other unchallenged findings support the trial court's finding that McKinley engaged in abusive use of conflict by using the disclosure as a means to change the parenting plan without a basis. In doing so, Sommer specifically notes the trial court's findings that (1) there was no credible evidence that Sommer abused PJM and (2) it was not credible that McKinley did not think she could file an emergency motion after she found out about PJM's disclosure of abuse because the parenting plan was pending on appeal.[18] Because these are unchallenged, we treat them as verities. *Cowiche Canyon Conservancy*, 118 Wn.2d at 808.

_____

[18] Sommer also claims that "[t]he trial court also found that despite the seriousness of the allegation it was apparent McKinley did not believe [PJM] had been injured by Sommer since she never discussed the issue with Porter, who she knew regularly brought [PJM] into contact with Sommer during his residential time," Br. of Resp't at 31-32 (citing to CP at 80-81). However, it does not appear that the trial court expressly make such a finding. Instead, it stated, in part, that Sommer and Porter planned "events to aid in the relationship of half-brothers" and "If [McKinley] believes Mr. Sommer abused a child, it is illogical to then ask the court to grant Mr. Sommer unsupervised time with [JS]," among other things. CP at 80-81.

However, even if these findings supported McKinley bringing her motion in bad faith, the trial court could not have properly relied on McKinley merely engaging in aggressive or improper litigation as a basis for finding abusive use of conflict. *See* RCW 26.09.191(3)(e) ("Litigation that is aggressive or improper but that does not meet the definition of abusive litigation shall not constitute a basis for a finding under this section."). Neither could the trial court have relied on a finding of abusive litigation as a basis for an abusive use of conflict finding given its findings of fact. Abusive litigation, for purposes of abusive use of conflict, is defined in RCW 26.51.020. Here, even if McKinley's actions in bringing her motion amounted to bad faith, McKinley had not been found to have engaged in domestic violence against Sommer, and so the trial court could not have found that abusive litigation occurred. *See* RCW 26.51.020(1)(a)(ii) (requiring a specific court finding of domestic violence for conduct to meet the definition of "abusive litigation").

Under RCW 26.09.191(3)(e), the trial court relied on its findings about PJM's disclosure to Porter, McKinley orchestrating the disclosure, and McKinley acting in bad faith to find that McKinley engaged in abusive use of conflict. Based on our analysis above, we concluded that Porter's testimony about PJM's disclosure to Porter was inadmissible hearsay and, thus, the trial court's finding that McKinley orchestrated the disclosure was unsupported by admissible evidence.

Without those findings, the only basis remaining for the trial court to find abusive use of conflict because of McKinley acting in "bad faith" was bad faith litigation—that there was no credible evidence that Sommer abused PJM and it was not credible that McKinley believed she could not file an emergency motion immediately after she learned about PJM's disclosure.

28

Given this, McKinley's motion, within the context of RCW 26.09.191(3)(e), at most amounted to aggressive or improper litigation and not abusive litigation under RCW 26.51.020. Accordingly, the trial court could not find that she engaged in abusive use of conflict under RCW 26.09.191(3)(e) based on her actions bringing the motion.

RCW 26.09.191(3)(g) provides that a trial court may impose restrictions on a parent if it expressly finds that "other factors or conduct . . . [are] adverse to the best interests of the child." However, neither of the parties addresses this basis and Sommer does not argue that it applies. Additionally, the trial court imposed restrictions on McKinley based only on RCW 26.09.191(3)(e), and, arguably, only found that McKinley's conduct could have, but did not unequivocally have, an adverse effect on JS's best interests. *See* CP at 82 ("McKinley has engaged in abusive use of conflict that *may* have adverse effect on [JS]'s best interests under 26.09.191(3)(e).") (Emphasis added.)

Under .191(3)(e), we hold that the trial court's reliance on the hearsay evidence to support its orchestration and coaching findings was prejudicial, even in light of the remaining uncontested findings. Because the unsupported findings were prejudicial and material to the trial court's finding that McKinley engaged in an abusive use of conflict, reversal is warranted.[19]

---

[19] McKinley raises multiple other claims related to the final parenting plan. She argues that (1) the trial court abused its discretion in excluding Schank's treatment notes, prohibiting Schank from refreshing her recollection with the notes, and excluding the CPS report; (2) multiple findings of fact were unsupported and the conclusions of law were not based on supported findings of fact; and (3) the trial court imposed parenting plan limitations not reasonably calculated to address identified harm and in violation of McKinley's right to free speech. However, because we reverse and vacate the parenting plan, we decline to consider the merits of these other claims as they are now moot.

### III. CHILD SUPPORT ORDER

McKinley argues that the trial court erred in its child support order by (1) imputing McKinley's income despite representing that it was accepting her proposed income, (2) setting Sommer's income to an amount after Sommer admitted to netting more, and (3) ordering each party to be responsible for certain work-related childcare.[20]  We disagree.

We review a trial court's child support order for an abuse of discretion.  *In re Marriage of Shortway*, 4 Wn. App. 2d 409, 418, 423 P.3d 270 (2018).

First, McKinley claims that the trial court erred by entering orders that imputed income to McKinley when it stated in its oral ruling it accepted her proposed income.  McKinley does not challenge the amount of income the trial court imputed to McKinley: the exact amount of income McKinley claimed to have at trial.  Instead, McKinley's arguments center around the fact that the trial court imputed income to McKinley and its reasons for doing so.

Even if we assume without deciding the trial court abused its discretion in imputing income to McKinley, McKinley's argument fails because she does not show any prejudicial effect such error could have had in the outcome when the amount of income used in the child support order is the same as that which McKinley proposed at trial.  *See* CP at 65, Ex. 38 at PDF 302.; *In re Welfare of M.G.*, 148 Wn. App. 781, 791, 201 P.3d 354 (2009) ("Error without prejudice . . . is not grounds for reversal.").

---

[20] McKinley appears to argue also that the trial court improperly required only McKinley to update her financial documents.  However, as McKinley neither cites to the record nor any legal authority for her argument here, we decline to consider the merits of this argument because it is insufficiently briefed.  RAP 10.3(a)(6).

Next, McKinley asserts that the trial court abused its discretion in finding Sommer's actual income to be an amount lower than what he admitted to at trial. However, the court found Sommer's income was consistent with his proposed schedule worksheet, his testimony, and McKinley's own proposed worksheet. McKinley points to other admitted evidence in arguing that Sommer admitted to his income actually being higher. But, after the trial court has weighed the evidence, we do not thereafter weigh the evidence presented. *Wilson*, 165 Wn. App. at 340.

Finally, McKinley argues that the trial court erred in ordering each party to be responsible for work-related childcare beyond preschool, school, and before/after school care. However, the child support order indicates that McKinley and Sommer must pay pro rata for expenses for "Education, . . . and work related before/after school care." CP at 69. Instead of assigning error to this provision, McKinley assigns error to a term existing as part of the parenting plan. Because we reverse and vacate the parenting plan, we decline to reach the merits of her argument regarding that provision as its language is now obsolete.

We hold that McKinley's arguments related to the final child support order accordingly fail.[21]

## IV. CHILDCARE EXPENSES

McKinley argues that the trial court improperly refused to enforce prior orders against Sommer related to childcare expenses incurred during the summer of 2022, before the September 2022 child support order. However, in claiming that the trial court erred in not requiring

---

[21] We acknowledge that, because we reverse the 2024 parenting plan, the trial court may set a different residential schedule on remand. Although we affirm the child support order, we do not hold that the trial court is restricted from making changes to the child support order in light of the trial court's actions resulting from remand. *See* RCW 26.19.075(1)(d) (including the residential schedule as a permissible reason for deviating from a child support standard calculation).

Sommer to reimburse McKinley for certain expenses, McKinley fails to acknowledge or address how she was prejudiced given unchallenged findings of fact regarding Sommer overpaying for expenses that occurred after September 2022.

In the trial court's written findings of fact, the trial court noted that exhibit 142 indicated that McKinley could have to repay Sommer for overpayment of childcare expenses. But the trial court ultimately denied Sommer's reimbursement request because it found that "repayment would not allow [] McKinley time to adjust to the fact she will pay child support, instead of receive support, and could lead to insufficient funds in her household to support her children." CP at 83.

Given these findings, McKinley fails to explain how, even if the trial court did err in refusing to order reimbursement from Sommer, any error was prejudicial. *See M.G.*, 148 Wn. App. at 791. Exhibit 142 indicated that McKinley owed Sommer more than she alleged that Sommer owed her for expenses prior to September 2022. Despite that, the trial court did not order McKinley to reimburse Sommer. Accordingly, McKinley's fails to show that any error would have prejudiced her, and, thus, her claim fails.

## V. CR 11 SANCTIONS AND ATTORNEY FEES AND COSTS

McKinley argues that the trial court abused its discretion in imposing CR 11 sanctions against her and, relatedly, awarding Sommer attorney fees and costs below. Among other grounds, McKinley argues that the trial court erred in doing so because no evidence supports its finding that McKinley orchestrated the disclosures. Consistent with our discussion above, we agree.

Through CR 11, an attorney's signature on pleadings, motions, and legal memoranda certified that:

> to the best of the party's or attorney's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) [the pleading, motion, or legal memorandum] is well grounded in fact; (2) it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

CR 11. If a trial court finds that such a document is signed in violation of the rule, a trial court may impose "an appropriate sanction" on the signatory, a represented party, or both. CR 11. Such sanctions may include reasonable expenses and attorney fees "incurred because of the filing." CR 11. We review a trial court's decision to impose sanctions under CR 11 for an abuse of discretion. *Biggs v. Vail*, 124 Wn.2d 193, 197, 876 P.2d 448 (1994).

Here, the trial court imposed CR 11 sanctions on McKinley and ordered her to pay Sommer attorney fees and costs. However, in concluding that CR 11 sanctions were appropriate, the trial court based its conclusion on a finding that "McKinley drafted and filed a frivolous motion based on orchestrated evidence." CR at 84. Like the similar findings above regarding the parenting plan, this finding was unsupported because the only evidence presented that McKinley orchestrated evidence was inadmissible as hearsay. Thus, the trial court's decision to impose CR 11 sanctions based on untenable grounds because its relied-on finding was unsupported. *See French*, 32 Wn. App. 2d at 314-15 ("An abuse of discretion occurs if the trial court's decision is manifestly unreasonable or based on untenable grounds or reasons. A decision

is based on untenable grounds or reasons if it is factually unsupported or was reached by applying an incorrect legal standard.") (internal citations omitted).

We hold that the trial court abused its discretion in imposing CR 11 sanctions and, accordingly, awarding attorney fees and costs to Sommer under this basis.[22]

## VI.  NEW JUDGE ON REMAND

McKinley requests that we remand to a different judge to avoid an appearance of fairness violation or bias.

To avoid the appearance of unfairness or bias, reassignment to a new judge on remand is appropriate.  *In re Marriage of Muhammad*, 153 Wn.2d 795, 807, 108 P.3d 779 (2005).  Where "the trial judge will exercise discretion on remand regarding the very issue that triggered the appeal and has already been exposed to prohibited information, expressed an opinion as to the merits, or otherwise prejudged the issue," we may instruct for reassignment on remand.  *State v. McEnroe*, 181 Wn.2d 375, 387, 333 P.3d 402 (2014) (footnotes omitted).  Because the trial judge has already expressed an opinion as to the merits and been exposed to inadmissible evidence which was an issue triggering this appeal, we hold that reassignment before a different judge is appropriate under the facts of this case.

---

[22] McKinley also claims that (1) the trial court abused its discretion in refusing to appoint a guardian ad litem, (2) procedural issues plagued the reconsideration proceedings, (3) the trial court abused its discretion by treating the reconsideration hearing as a modification, and (4) the trial was unfair.  However, for all of these, we decline to address the merits of these claims because McKinley's briefing of these arguments is insufficient to facilitate meaningful review. For each of these claims, McKinley fails to cite to legal authorities in support of her assertions and/or fails to provide citations to the applicable parts of the record.  *See* RAP 10.3(a)(6).

ATTORNEY FEES AND COSTS

Both parties ask this court to order the other to pay their attorney fees and/or costs on appeal. We decline both requests.

Under RAP 18.1(a), we may award attorney fees and costs "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review" before our court.

McKinley requests costs on appeal but fails to cite to any legal authority supporting her request. For this reason, we decline to award her costs. *See Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (2012) ("Argument and citation to authority are required under [RAP 18.1(b)] to advise the court of the appropriate grounds for an award of attorney fees as costs.").

Sommer requests attorney fees and costs because this appeal "aris[es] from McKinley's bad faith motion for reconsideration, which resulted in the trial court awarding fees to Sommer below for McKinley's intransigence as a CR 11 sanction." Br. of Resp't at 86. We may award attorney fees and costs when a party has been intransigent and their "appeal 'amounts to little more than an effort to carry on with the same efforts which caused [them] to lose credibility with the trial court.'" *In re Marriage of Bresnahan*, 21 Wn. App. 2d 385, 413, 505 P.3d 1218 (2022) (alteration in original) (quoting *In re Marriage of Sievers*, 78 Wn. App. 287, 312, 897 P.2d 388 (1995)). However, as discussed, the trial court's determination that McKinley's motion was in bad faith was unsupported by substantial admissible evidence. Therefore, we do not award Sommer attorney fees and costs on appeal.

CONCLUSION

We reverse and vacate the trial court's final parenting plan and imposition of CR 11 sanctions and attorney fees, but affirm the child support order. However, if revising the child

No. 59321-1-II

support order is necessary following entering a new parenting plan, the trial court is free to do so.

We remand to the trial court and instruct that this matter be assigned to a different trial judge and

handled as expeditiously as possible.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Che, J.

We concur:

Glasgow, J.

Veljacic, A.C.J.